# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| A.F., by and through his parents and guardians, Brenna Legaard and Scott Fournier; and A.P., by and through his parents and guardians, Lucia Alonso and Luis Partida, and on behalf of similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> **PROVIDENCE HEALTH PLAN**, <br><br> Defendant. | Case No. 3:13-cv-00776-SI <br><br> **OPINION AND ORDER** |

Keith S. Dubanevich, Joshua L. Ross, and Nadine A. Gartner, STOLL STOLL BERNE LOKTING & SHLACHTER, P.C., 209 S.W. Oak Street, Suite 500, Portland, OR 97204; Megan E. Glor, MEGAN E. GLOR, ATTORNEYS AT LAW P.C., 621 S.W. Morrison Street, Suite 900, Portland, OR 97205. Of Attorneys for Plaintiffs.

William F. Gary, Arden J. Olson, and Aaron Landau, HARRANG LONG GARY RUDNICK, P.C., 360 East 10th Avenue, Suite 300, Eugene, OR 97401; Aaron T. Bals, HARRANG LONG GARY RUDNICK, P.C., 1001 S.W. Fifth Avenue, Suite 1650, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Autism Spectrum Disorder is a pervasive developmental disorder that begins to appear during early childhood and is characterized by impairments in communication and social skills,

PAGE 1 – OPINION AND ORDER

severely restricted interests, and repetitive behavior. Applied Behavior Analysis ("ABA") is an early intensive behavioral interaction health service that helps people with autism to perform social, motor, verbal, behavior, and reasoning functions that they would not otherwise be able to do. Plaintiffs A.F. and A.P. (collectively "Plaintiffs") are both covered as dependent-beneficiaries under group health insurance plans issued by Defendant Providence Health Plan ("Providence"). A.F. and A.P. were denied coverage of ABA therapy by Providence—both initially and on appeal—based on Providence's "Developmental Disability Exclusion."

Plaintiffs bring this class action lawsuit, alleging that Providence's denial of ABA therapy on the basis of its Developmental Disability Exclusion violates the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*; the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act ("Federal Parity Act"), 29 U.S.C. § 1185a; and two Oregon state laws, Or. Rev. Stat. §§ 743A.168 and 743A.190. Plaintiffs moved for class certification, which the Court granted. The parties have agreed that the Court should treat their pending motions as cross motions for partial summary judgment. For the reasons that follow, the court grants partial summary judgment for Plaintiffs and denies Defendant's cross motion. Providence's Developmental Disability Exclusion violates both the Federal Parity Act and Oregon law and is therefore prohibited under ERISA.

## STANDARDS

### A.  De Novo Review

Judicial review of an ERISA-governed insurance policy that grants the insurer discretion to determine a claimant's eligibility for benefits is ordinarily reviewed for "abuse of discretion." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a court reviews questions of statutory interpretation, however, it owes no deference to the insurer's decision and reviews legal questions *de novo*. *Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*,

994 F.2d 692, 694 (9th Cir. 1993). The issues presented in the pending motions are questions of statutory interpretation.

## B.  Motion for Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

Where parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only

prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

Plaintiffs A.F. and A.P. are both insured as dependent-beneficiaries under group health plans in Oregon provided by Providence. A.F. and A.P. have both been diagnosed with Autism Spectrum Disorder and prescribed ABA therapy by their treating physicians. ABA therapy is an intensive behavior therapy that, among other things, measures and evaluates observable behaviors. Evidence shows that ABA therapy may help autistic children with cognitive function, language skills, and adaptive behavior. Evidence also suggests that the benefits of ABA are significantly greater with early intervention for young autistic children. Before January 2014, Providence denied all requests for coverage of ABA therapy.

In 2012, Providence denied a request by A.F.'s parents for reimbursement for the expenses of ABA therapy. A.F.'s parents appealed the initial denial, which Providence also denied. When A.F.'s parents appealed a second time, Providence denied the second appeal and provided this explanation:

> Under the language of the Oregon Group Member Handbook for Open Option Plans, services "related to developmental disabilities, developmental delays or learning disabilities" are specifically excluded from coverage under this plan. (See Group Member Handbook, at 43). There is no question that autism spectrum disorder is a "developmental disability" or involves "developmental delay," and PHP [Providence Health Plan] here has so interpreted it, in this case as it has in other cases seeking ABA services for autism spectrum disorder. Because ABA

> services are related to autism spectrum disorder, they are therefore
> not benefits covered under the plan.

Declatation of Joshua L. Ross ("Ross Decl.") Ex. C at 9., Dkt. 41-3.

Also in 2012, Providence denied the request by A.P.'s physician for authorization of

ABA therapy to treat A.P.'s autism. A.P.'s parents appealed Providence's denial, and Providence

denied the appeal. Providence provided the following explanation, which is almost identical to

the explanation provided to A.F., to A.P.'s parents:

> Under the language of the Oregon Group Member Handbook for
> Open Option Plans, mental health services "related to
> developmental disabilities, developmental delays or learning
> disabilities" are specifically excluded from coverage under this
> plan. (See Group Member Handbook, at 41). There is no question
> that autism spectrum disorder is a "developmental disability"
> or involves "developmental delay," and Providence as the plan
> administrator here has so interpreted it, in this case as it has in
> other cases seeking ABA services for autism spectrum disorder.
> Because ABA services are mental health services related to autism
> spectrum disorder, they are therefore not benefits covered under
> the plan.

Ross Decl. Ex. D at 8., Dkt. 41-4.

Thus, in both cases, Providence denied coverage of ABA therapy because it is a service

"related to developmental disabilities, developmental delays or learning disabilities." *Id.* This

exclusion (hereinafter, "the Developmental Disability Exclusion") is included in all of the group

plan insurance contracts issued by Providence after 2007. The Developmental Disability

Exclusion is listed in the member handbook given to all members that describes the governing

terms of the insurance plans.

Providence issues two types of plans: "self-insured" group plans and "insured" group

plans. Under a "self-insured" plan, the employer carries the risk of coverage. Under an "insured"

plan, Providence carries the risk of coverage. Both the "self-insured" and "insured" plans are

subject to Oregon law and ERISA. Plaintiffs and all class members are members of "insured"

group plans. Providence is both the administrator of these plans and a fiduciary to all plan members. As such, Providence is obligated to apply exclusions consistently and uniformly.

Providence uses diagnosis codes and current procedural terminology ("CPT") codes to process members' claims. The diagnosis codes for Autism Spectrum Disorder all start with 299. There is no CPT code for ABA therapy.

Although Providence's group plans differ in terms of the specific benefits provided to group members, all of the group plan contracts issued after January 1, 2007 contain several identical provisions, including: (1) coverage for "Mental Health Services;" (2) a definition of "Mental Health Services" that includes coverage of autism; and (3) exclusion of coverage for "services related to developmental disabilities, developmental delays, or learning disabilities" (the Developmental Disability Exclusion). Before 2014, Providence denied coverage of ABA therapy under the Developmental Disability Exclusion for all group members under all group plans, regardless of whether the member seeks reimbursement for payments for ABA therapy or pre-authorization of coverage.

Plaintiffs previously moved to certify the class. The Court granted class certification and defined the class to include the following persons:

> All individuals: (a) who are, or will be up to the date of class certification, beneficiaries of an ERISA health benefit plan (i) that is subject to Oregon law, (ii) that contains an Exclusion for services related to developmental disabilities, developmental delays, or learning disabilities, (iii) and that has been or will be issued for delivery, or renewed, on or after January 1, 2007 up to the date of class certification, in the state of Oregon, by Providence Health Plan or any affiliate of Providence Health Plan, its predecessors or successors and all subsidiaries or parent entities; (b) who either have been or will be diagnosed, up to the date of class certification, with any diagnosis code beginning with 299 contained in either the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR, Fourth Edition) or the International Classification of Diseases, Ninth Edition (ICD-9); and (c) who are

> not (i) a parent, subsidiary, affiliate, or control person of
> Defendant, (ii) an officer, director, agent, servant or employee of
> Defendant, (iii) the immediate family member of any such person,
> or (iv) a class member who has previously released a claim for
> benefits under a settlement agreement.

*A.F. ex rel. Legaard v. Providence Health Plan*, ---F.R.D.---, 2013 WL 6796095, at *4 (D. Or. Dec. 24, 2013).

After the Court granted class certification, but before the current motions were fully briefed, Providence changed its policy regarding covering ABA therapy for children with autism. Oregon Senate Bill 365 was passed by the Oregon Legislature in 2013, but is not effective until January 1, 2015. That law requires that insurance companies in Oregon provide coverage for ABA therapy for children eight years of age and younger for up to 25 hours per week. In response to the passage of Oregon Senate Bill 365, Providence decided voluntarily to implement the coverage sooner than required. The parties agree that because the issue in this case is whether the Developmental Disability Exclusion is lawful and because plan members often seek coverage for ABA therapy for more than 25 hours per week and for children over age eight, Providence's decision to implement Oregon Senate Bill 365 early does not render moot the issues raised in this lawsuit.

## DISCUSSION

### A. ERISA Civil Enforcement

Plaintiffs argue that Providence's denial of coverage of ABA under the Developmental Disability Exclusion is unlawful in three ways: (1) by violating the Oregon Mental Health Parity Act, Or. Rev. Stat. § 743A.168; (2) by violating the Oregon Mandatory Coverage for Minors with Pervasive Developmental Disorders Act, Or. Rev. Stat. § 743A.190; and (3) by violating the Federal Parity Act, 29 U.S.C. § 1185a. Plaintiffs bring each of these claims under the ERISA civil enforcement provision, 29 U.S.C. § 1132(a)(3), which provides a cause of action for

violations of ERISA itself and, under certain circumstances, violations of state law regulating insurance.

Plan participants and beneficiaries of group policies may bring actions under ERISA's civil enforcement provision to challenge violations of ERISA and the terms of ERISA plans. The ERISA civil enforcement provision provides:

> A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). Because the Federal Parity act is enacted as part of ERISA, it is enforceable through a cause of actions under § 1132(a)(3) as a violation of a "provision of this subchapter." *See id.* Or. Rev. Stat. §§ 743A.168 and 743A.190, on the other hand, are, for the reasons discussed below, enforceable through a cause of action under § 1132(a)(3) as "terms of the plan." *Id.*

It is a general principle of insurance law that all insurance plans include all applicable requirements and restrictions imposed by state law. 2 *Couch on Insurance* § 19:1 (3d ed. 2011). State law regulating insurance thus "enter[s] into and form[s] a part of all contracts of insurance to which [it is] applicable." *Id.* When an insurance policy provision is "in conflict with, or repugnant to, statutory provisions which are applicable to the contract," the inconsistent insurance policy provisions are invalid "since contracts cannot change existing statutory laws." *Id.* at § 19:3. Moreover, when such a conflict exists, "the statutory requirements supersede the conflicting policy provisions and become part of the insurance policy itself." *Id.*

The Supreme Court has repeatedly held that state law regulating insurance applies to ERISA insurance plans, despite the fact that other state laws are preempted by ERISA. *See*

*UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 376 (1999) ("We have repeatedly held that state laws mandating insurance contract terms are saved from preemption under § 1144(b)(2)(A)."); *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 733 (1985) (discussing the ERISA insurance savings clause, which states that nothing in ERISA "shall be construed to exempt or relieve any person from any law of any State which regulates insurance") (quoting 29 U.S.C. § 1144(b)(2)(a)) (quotation marks omitted). Section 1144(b)(2)(A), which has come to be known as the "savings clause," states: "Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). Therefore, the general rule of insurance law—that  insurance contracts are subject to and incorporate relevant state law regulating insurance—applies with equal force to ERISA insurance plans.[1] To the extent that Oregon insurance regulations are in conflict with the provisions of Providence's plans, those regulations will "become part of the insurance policy itself." *See Couch on Insurance* § 19:3.

Thus, because the ERISA civil enforcement provision allows courts to enjoin or provide other appropriate equitable relief when a practice violates any "terms of the plan," and because state law regulating insurance, when in conflict with terms of an insurance plan, "supersede the conflicting policy provisions and become part of the plan itself," *see Couch on Insurance* § 19:3, ERISA provides courts with the power to enjoin violations of state law regulating insurance that

---

[1] Oregon's insurance coverage mandates are also incorporated into Providence's insurance policy as a matter of express contract: "The laws of the State of Oregon govern the interpretation of this Group Contract and the administration of benefits to members, except as provided in section 14.11 [addressing non-transferability of benefits]." Decl. Brenna Legaad Ex. 1, at 77, Dkt. 62.

have become part of the terms of the plan. *See, e.g.*, *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 721 (9th Cir. 2012) *cert denied* 133 S. Ct. 1492 (U.S. 2013).[2]

## B.  Plaintiffs' ERISA Claims for Violation of Or. Rev. Stat. §§ 743A.168 and 743A.190

### 1.  Oregon Statutory Interpretation

Plaintiffs argue that Providence's Developmental Disability Exclusion violates two Oregon laws: Or. Rev. Stat. § 743A.168 and § 743A.190. The Court interprets these statutes applying Oregon statutory interpretation principles. *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1209 (9th Cir. 2010) (a federal court interpreting Oregon law should "interpret the law as would the [Oregon] Supreme Court" (alteration in original)). Under Oregon law, the "first step" of statutory interpretation is an examination of the text and context of the statute in order "to discern the intent of the legislature. *Portland Gen. Elec. Co. v. Bureau of Labor & Indus.*, 317 Or. 606, 610 (1993), *superseded by statute*, Or. Rev. Stat. § 174.020; *see State v. Gaines*, 346 Or. 160, 171 (2009) (explaining that Or. Rev. Stat. § 174.020 did not alter the *Portland General Electric* holding regarding the first step of statutory interpretation). "[A]fter examining the text and context," the court will "consult" the legislative history, "even if the court does not perceive an ambiguity in the statute's text, where that legislative history appears useful to the court's analysis." *Gaines*, 346 Or. at 172. The "evaluative weight" given to the legislative history is for the court to determine. *Id.* At "the third[] and final step[] of the interpretive methodology," if "the legislature's intent remains unclear after examining text, context, and legislative history, the

---

[2] Providence cites *Haviland v. Metropolitan Life Insurance Co.*, 876 F. Supp. 2d 946 (E.D. Mich. 2012), *aff'd*, 730 F.3d 563 (6th Cir. 2013), *cert denied*, 134 S. Ct. 1790 (2014), for the proposition that ERISA preempts state law and then argues that Plaintiffs are not entitled to ERISA relief for violations of state law. The *Haviland* case, however, addressed a state consumer protection law, which is a state law that did not regulate the insurance industry and thus was not "saved" by ERISA § 1144(b)(2)(A). The *Haviland* case, therefore, does not assist Providence in the pending lawsuit.

court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *Id.*

### 2. Oregon Mental Health Parity Act

The Oregon Mental Health Parity Act, Or. Rev. Stat. § 743A.168, requires parity among the services and treatment covered for *medical* conditions and the services and treatment covered for *mental health and chemical dependency* related conditions. The statute states in relevant part:

> A group health insurance policy providing coverage for hospital or medical expenses shall provide coverage for expenses arising from treatment for chemical dependency, including alcoholism, and for mental or nervous conditions at the same level as, and subject to limitations no more restrictive than, those imposed on coverage or reimbursement of expenses arising from treatment for other medical conditions.

Or. Rev. Stat. § 743A.168. After the enactment of the Oregon Mental Health Parity Act, several Oregon Administrative Rules were issued to help interpret the statute. "Validly promulgated administrative rules have the force of law." *Haskins v. Emp't Dep't,* 156 Or. App. 285, 288 (1998) (en banc). "Administrative rules and regulations are to be regarded as legislative enactments having the same effect as if enacted by the legislature as part of the original statute." *Bronson v. Moonen,* 270 Or. 469, 476 (1974).

One particularly relevant administrative rule interpreting § 743A.168 is Oregon Administrative Rule 836-053-1405(1), which provides:

> A group health insurance policy issued or renewed in this state shall provide coverage or reimbursement for **medically necessary** treatment of mental or nervous conditions . . . at the same level as, and subject to limitations no more restrictive than those imposed on coverage or reimbursement for medically necessary treatment for other medical conditions.

Or. Admin. R. 836-053-1405(1) (emphasis added). Additionally, Oregon Administrative Rule 836-053-1404 defines "mental and nervous conditions" as "all disorders listed in the 'Diagnostic

and Statistical Manual of Mental Disorders, DSM-IV-TR, Fourth Edition' except for [certain diagnostic codes not relevant here]." Or. Admin. R. 836-053-1404(1)(a)(A). Autism is a disorder listed in the Diagnostic Statistical Manual of Mental Disorders and the diagnostic code for autism, 299, is not listed among the exceptions. Thus, autism is a "mental and nervous condition" under the Oregon Mental Health Parity Act. *See id.*

Plaintiffs argue that the legislative intent of § 743A.168 was to prohibit such exclusions like the Developmental Disability Exclusion from excluding medically necessary ABA from coverage. Plaintiffs also argue that the statute and related administrative rules state that group health insurance policies "shall" provide coverage of medically necessary services for mental health conditions as other medical conditions and that the ordinary usage of the term "shall" creates a mandatory duty. *See Friends of the Columbia Gorge, Inc. v. Columbia River Gorge Comm'n*, 346 Or. 415, 426-27 (2009). In other words, Plaintiffs contend that Or. Rev. Stat. § 743A.168 "mandates" coverage of ABA therapy.

Providence responds that the phrases "at the same level" and "subject to limitations no more restrictive than" indicate that § 743A.168 is not a coverage mandate for particular services, but rather requires that any *service* that the group plan covers for mental health conditions is covered at the same level as that same service would be covered for other medical conditions. Providence argues that if ABA is not a service covered for *medical* conditions, then Providence is free not to provide ABA for *mental health* conditions.

Looking to the text and context of the statute, Providence's focus on the word "services" is misplaced. The text of the statute requires coverage of treatment for mental health "conditions" at the same level as coverage for medical "conditions." Therefore, although the Oregon Mental Health Parity Act might not mandate coverage of a particular *service*, it does

mandate that Providence cover mental health *conditions* no more restrictively than it covers medical *conditions*. By stating that it covers autism (a developmental disability), but excluding coverage for all services "related to a developmental disability," Providence is not covering treatment for mental health conditions in parity with treatment for medical conditions. Providence cannot identify any medical condition covered by its plan where there was an exclusion that could, on its face, deny coverage for all services "related to" the treatment for that condition. Moreover, Providence cannot provide any examples of a medical condition where an exclusion was used to deny coverage of the primary and widely-respected medically necessary treatment for that medical condition. Because of the broad-based Developmental Disability Exclusion, Providence covers mental health conditions at a different level than medical conditions in violation of the parity obligations.

The Court also notes that if Providence's argument were accepted and insurance companies could cover a mental health condition but exclude coverage for medically necessary services "related to" that condition, the Oregon Mental Health Parity Act would have little to no meaning. For example, Providence could state that it covers depression, but refuse to cover psychotherapy or antidepressant medications, provided that it did not cover psychotherapy or antidepressant medications when those treatments were medically necessary to treat medical conditions. This interpretation is inconsistent with the context of the statute and its purpose to ensure that mental health conditions be covered in parity with medical conditions. Particularly considering that, because of the nature of mental health conditions, in many instances treatment that is medically necessary for mental health diagnoses would never be medically necessary for medical diagnoses. Insurers could thus use a broad exclusion, like the Developmental Disability Exclusion, to get around the parity requirement.

PAGE 13 – OPINION AND ORDER

Plaintiffs and Defendant each provided the Court with selections from the legislative history for this statute. The Court has considered this legislative history, but does not find it particularly useful or illuminating in interpreting § 743A.168. Therefore, in accordance with *State v. Gaines*, the Court accords the cited legislative history relatively little evaluative weight. *See Gaines*, 346 Or. at 171. Finally, because the meaning and legislative intent of the Oregon Mental Health Parity Act are clear after examining the text and context of the statute, the Court does not need to apply general maxims of statutory interpretation.[3] *Id.* at 172.

The Court also takes into consideration the fact that other federal courts in this district and state courts across the country have interpreted similar mental health parity acts to require insurance companies to cover ABA therapy under similar circumstances. The persuasive reasoning in these opinions provides further support for the Court's conclusion that § 743A.168 requires insurance companies to cover medically necessary services for covered mental health conditions.

In *McHenry v. PacificSource Health Plans*, 679 F. Supp. 2d 1226 (D. Or. 2010), U.S. Magistrate Judge Stewart analyzed, albeit in dicta, an exclusion of benefits for pervasive developmental disorders ("PDDs"), similar to the Developmental Disability Exclusion, and noted that the then-recently enacted Oregon Mental Health Parity Act resulted in the insurance company abandoning the exclusion. Judge Stewart wrote:

---

[3] The Court finds the statute's meaning to be clear after considering the text and context of the law. The Court notes, however, that if it were to proceed to step three of the *Gaines* analysis and consider maxims of statutory interpretation, the maxim that statutes should be interpreted to avoid an absurd result would be persuasive on this point. *See Griffin v, Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). The Court would interpret § 743A.168 to avoid the absurd result that insurance companies could decide not to cover medically necessary services for covered mental health conditions (thus obliterating parity) and still be in technical compliance with the Mental Health Parity Act.

> The status of this [PPD] exclusion was brought into question by legislation effective shortly after [the plaintiff's] diagnosis. In August 2005, the State of Oregon enacted the Mental Health Parity Act ("Parity Act"), which went into effect on January 1, 2007. *See* Or. Laws 2005, c. 705, § 1, codified at ORS 743.556 (renumbered ORS 743A.168). The Parity Act mandated that "[a] group health insurance policy providing coverage for hospital or medical expenses" must "provide coverage for expenses arising from treatment for . . . mental or nervous conditions at the same level as, and subject to limitations no more restrictive than, those imposed on coverage or reimbursement of expenses arising from treatment for other medical conditions." *Id.* This language required PacificSource to abandon its prior exclusion for PDDs in the 2006 Plan.

*Id.* at 1233 (footnote omitted). Judge Stewart, although only in dicta, indicated that a PPD would be invalid under the Oregon Mental Health Parity Act.

Similarly, a state appellate court in New Jersey addressed the New Jersey mental health parity act and an exclusion that barred from coverage occupational, speech, and physical therapy. The court wrote:

> [A]n exclusion from coverage for claims based upon occupational, speech, and physical therapy offered to developmentally disabled children would render meaningless the specific inclusion of PDD and autism within those biologically-based mental illnesses subject to the parity statute. . . . To read the governing statute as offering parity, but not affording coverage for medically necessary treatment of the very conditions that are the enumerated subjects of the parity provisions would be unreasonable.

*Markiewicz v. State Health Benefits Comm'n*, 915 A.2d 553 (N.J. App. Div. 2007); *see also Micheletti v. State Health Benefits Comm'n*, 913 A.2d 842, 849 (N.J. App. Div. 2007) ("If the [plan administrator] is correct in its reading, the statute would appear to promise much, but it really grants little or nothing for an autistic child. We cannot infer such a cruel intent by the Legislature.").

Thus, looking to the text and context of § 743A.168 as well as the persuasive case law, the Court finds that Providence cannot simultaneously purport to cover autism and yet deny

coverage for medically necessary ABA therapy through its Developmental Disability Exclusion consistent with the Oregon Mental Health Parity Act. Because of the Developmental Disability Exclusion, which provides a blanket exclusion for an entire family of mental health diagnoses, Providence is not providing equal coverage of mental health and medical conditions. The Court thus holds that the Developmental Disability Exclusion violates Or. Rev. Stat. §743A.168.

### 3. Oregon Mandatory Coverage for Minors with Pervasive Developmental Disorders Act

In 2007, the Oregon Legislature passed House Bill 2918, which requires health benefit plans to cover treatment of pervasive developmental disorders for children. The bill, codified as Or. Rev. Stat. § 743A.190, provides:

> (1) A health benefit plan, as defined in ORS 743.730, must cover for a child enrolled in the plan who is under 18 years of age and who has been diagnosed with a pervasive developmental disorder all medical services, including rehabilitation services, that are medically necessary and are otherwise covered under the plan.

> (2) The coverage required under subsection (1) of this section, including rehabilitation services, may be made subject to other provisions of the health benefit plan that apply to covered services, including but not limited to:

>> (a) Deductibles, copayments or coinsurance;

>> (b) Prior authorization or utilization review requirements; or

>> (c) Treatment limitations regarding the number of visits or the duration of treatment.

Or. Rev. Stat. § 743A.190(1) and (2). "Pervasive developmental disorder," defined in subsection (3) of the statute, includes "autism spectrum disorder." Or. Rev. Stat. § 743A.190(3)(b). In addition, subsection (3) defines "medically necessary" as "in accordance with the definition of medical necessity that is specified in the policy, certificate or contract for the health benefit plan

and that applies uniformly to all covered services under the health benefit plan," and "rehabilitation services" as "physical therapy, occupational therapy or speech therapy services to restore or improve function." Or. Rev. Stat. § 743A.190(3)(a), (c).

Plaintiffs argue that Or. Rev. Stat. § 743A.190 mandates coverage of all medically necessary medical services, including ABA therapy, for children with development disorders under the age of 18. Providence responds that ABA therapy does not fit within the definition of "medical services," that ABA therapy is not "otherwise covered" by Providence's plan, and therefore, that § 743A.190 does not mandate coverage of ABA therapy.

Plaintiffs, however, seek injunctive and declaratory relief, asking the Court to enjoin Providence from denying coverage based on its Developmental Disability Exclusion and to issue a declaration stating that Providence's Developmental Disability Exclusion violates applicable law. Thus, the issue before the Court is not whether Or. Rev. Stat. § 743A.190 mandates coverage of ABA therapy in the abstract, but rather, whether Providence can lawfully use the Developmental Disability Exclusion to deny coverage of ABA therapy—or stated another way, whether the Developmental Disability Exclusion violates Or. Rev. Stat. § 743A.190. Thus, specifically determining whether ABA therapy is a "medical service" that is "otherwise covered" by Providence is unnecessary.[4]

---

[4] If the Court were to interpret "medical services," it would find, and does find in the alternative, that ABA therapy is a medical service. Looking to the text and the context, the statute provides that a health benefit plan must cover "all medical services, including rehabilitation services, that are medically necessary and otherwise covered." Or. Rev. Stat. § 743A.190(1). "Rehabilitation services" is defined as "physical therapy, occupational therapy or speech therapy services to restore or improve function," but "medical services" is not explicitly defined in the statute. Or. Rev. Stat. § 743A.190(3). Plaintiffs argue that ABA therapy, like "physical therapy, occupational therapy or speech therapy," is a therapy service meant to "restore or improve function," and that therefore, ABA fits within the "plain, natural, and ordinary" definition of medical services if these other types of rehabilitation services fit within the definition of medical services. ABA is a widely accepted therapy that is "firmly supported by

To determine whether the Developmental Disability Exclusion violates Or. Rev. Stat. § 743A.190, the Court first looks to the text and context of the statute and then consults the legislative history to the extent that it is useful. *See Gaines*, 346 Or. at 171-72. The plain text of the statute, cited above, provides that a health plan must cover all medically necessary medical services for children with a pervasive developmental disorder that are otherwise covered. Providence contends that the common sense meaning of "otherwise covered" is that the medical services must be "otherwise covered" for plan members who do *not* have a developmental disorder. *See* Or. Rev. Stat. § 743A.190(1). Plaintiffs argue that the plain and ordinary meaning of "otherwise covered" is that the service would be subject to the plan's other coverage limitations, such as limitations on the number of visits and any "outside of network" physician restrictions. The Court assumes without deciding that Providence's interpretation is correct. The result is the same.

Providence's Developmental Disability Exclusion excludes from coverage services "related to developmental disabilities, developmental delays or learning disabilities." Ross Decl. Ex. D at 8., Dkt. 41-4. Although Providence does not appear to enforce the Developmental Disability Exclusion in all circumstances, on its face, the exclusion exempts from coverage all services related to a plan member's pervasive developmental disability. There are several

---

decades of research and application and is a well-established treatment modality of autism and other [pervasive developmental disorders]." *McHenry*, 679 F. Supp. 2d at 1237. Based on the text and context of the statute—including the statutory definition of "rehabilitation services"—the Court agrees that ABA therapy fits within the ordinary definition of medical services. *Accord Hummel v. Ohio Dep't of Job & Family Servs.*, 844 N.E.2d 360, 366 (Ct. App. Ohio 2005) (interpreting "medical service" to include ABA therapy under the ordinary definition); *K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1276-77 (S.D. Fl. 2011) (holding that ABA therapy is a medical service that must be covered under Medicaid), *affirmed in relevant part Garrido v. Dudek*, 731 F.3d 1152 (11th Cir. 2002); *Chisholm ex rel. CC, MC v. Kliebert*, 2013 WL 3807990, at *22 (E.D. La. July 18, 2013) (holding that ABA therapy when recommended by a physician or psychologist constitutes "medical assistance")

services that would be considered "related to" a developmental disorder—for example speech therapy, physical therapy, and psychotherapy—that are covered by Providence for other plan members.

In other words, if a plan member requested coverage for speech therapy related to his or her developmental disability, Providence *could* deny coverage under the exclusion, but still provide coverage for speech therapy for a different plan member who does not have a developmental disability. Regardless of whether or not Providence chooses always to enforce its Developmental Disability Exclusion, the exclusion on its face directly violates Or. Rev. Stat. § 743A.190. As such, even accepting Providence's interpretation of "otherwise covered," the Developmental Disability Exclusion conflicts with the statute.

Although the plain text of the statute is clear, the legislative history further supports the conclusion that the Developmental Disability Exclusion violates Or. Rev. Stat. § 743A.190. Both parties cited extensive legislative history to support their arguments.[5] For example, in a speech cited by Providence, Representative Sara Gelser explained the purpose of the proposed legislation. She stated:

---

[5] Plaintiffs cite to the testimony of several advocates and legislators discussing how the bill would provide coverage for ABA therapy. Of particular relevance, is the testimony of Representative Mitch Greenlick in support of the House Bill 2918. Representative Greenlick discussed the United States Surgeon General's statement describing a study of ABA therapy that demonstrated "the efficacy of [ABA] in reducing inappropriate behavior and in increasing communication, learning, and appropriate social behavior." Or. H.R. H. Health Care Subcomm. On Health Care Access, Rep. Mitch Greenlick, H.B. 2918, Mar. 14, 2007, Gartner Decl. Ex. H. This testimony in support of the bill, regarding the importance of ABA therapy, indicates that the legislators believed that ABA therapy would be included in the definition of "medical services." Providence points out that all of this testimony cited by Plaintiffs took place in March of 2007, in support of a previous (and more expansive) version of the bill. The original bill stated: "All health benefit plans, as defined in ORS 743.730, shall provide coverage for treatment of a pervasive developmental disorder that is prescribed by the beneficiary's physician in accordance with a treatment plan." H.B. 2918 § 2(1), 74th Leg. Assemb., Reg. Sess. (Or. 2007) (as introduced). This legislative history regarding an earlier version of the bill is less probative.

> [C]hildren with autism or pervasive developmental delay, learning
> disabilities, mental retardation are routinely denied services that
> are available to other members of their family under the same
> health insurance plan because they are people with learning
> disabilities, developmental disabilities and developmental delays. .
> . . And so what this amendment does, basically, is it just creates
> some equity within an insurance plan that says if speech therapy is
> covered for Betty in a family, it should also be covered for Ben,
> even if he has autism, at the same level of coverage that it's offered
> to Betty.

H. Comm. on Health Care, Testimony of Rep. Sara Gelser, H.B. 2918, April 25, 2007, Olson

Decl. Ex 1 at 4, Dkt. 70-1. Representative Gelser's testimony supports, rather than diminishes,

the conclusion that the Developmental Disability Exclusion, which could, on its face, in some

instances deny a person with a developmental disability a service that is otherwise provided by

Providence to plan members without a developmental disability, is in conflict with Or. Rev. Stat.

§ 743A.190.

The House Staff Member Summary of the bill also interpreted the statute consistently

with the Court's interpretation. It specified that the bill ensures "that health benefit plans may not

deny benefits to an individual who is covered under the plan due to the diagnosis of pervasive

developmental disorder." Staff Measure Summary, H.B. 2918 A, 74th Leg. Assemb., Reg. Sess.

(Or. 2007), Olson Decl. Ex 3., Dkt. 70-3. Moreover, after the bill passed the Oregon House of

Representatives and the Oregon Senate, Representative Peter Buckley—a member of the Joint

Ways and Means Committee—testified as follows:

> We are asking for nothing more or less than what is available to a
> child without the diagnosis of pervasive developmental disorder or
> autism. . . . We have compromised down with the insurance
> companies to only require the same medically necessary benefits
> for developmentally disordered children that non-developmentally
> disordered children are offered under the exact same polices.

Joint Comm. On Ways and Means, Transp. & Econ. Dev. Subcomm., Testimony of Rep.

Buckley, H.B. 2918, 74th Leg. Assemb. Reg. Sess. (Or. 2007), June 16, 2007, Olson Decl. Ex 5

at 7-8, Dkt. 70-5. Representative Buckley further provided this useful example:

> Two children live on the same street. The evaluations for both
> children indicate the same need for physical therapy. One child
> experienced a stroke at four months so has access to covered
> benefits because it was the result of an illness or injury. The other
> child, same age, whose disability occurred prior to birth, is given a
> label of developmental disability and is therefore denied access to
> the family's covered health benefits.

*Id.* at 11-12. Representative Buckley concluded by saying that this bill would prevent insurers

from covering this first child's physical therapy and not covering the second child's physical

therapy. This testimony supports the proposition that the statute prohibits an insurer from

refusing to cover a service for a developmentally disabled child that is otherwise covered for

other plan members.

The text, context, and legislative history thus make it clear that an insurer cannot provide

coverage for a service for one child and deny coverage for the same service for another child

solely because the second child suffers from a developmental disability. The Developmental

Disability Exclusion, however, would allow just that. It permits Providence to deny coverage for

services as "related to a developmental disability" that otherwise would be covered for other plan

members who do not have developmental disabilities. Whether or not Providence chooses

consistently to enforce the Developmental Disability Exclusion does not matter. On its face, the

Developmental Disability Exclusion violates Or. Rev. Stat. § 743A.190.

**C. Plaintiffs' ERISA Claim for Violation of the Federal Parity Act**

Plaintiffs argue that Providence's Developmental Disability Exclusion is also unlawful

under the Federal Parity Act, 29 U.S.C. § 1185a(a)(3)(A)(ii). This law requires that for group

health plans, financial requirements and treatment limitations to mental health benefits must be

no more restrictive than the predominant requirements or limitations applied to substantially all medical and surgical benefits.[6] Providence argues that the Federal Parity Act, like the Oregon Mental Health Parity Act, does not mandate, or require, coverage of any specific service or treatment, but merely states that if a certain service or treatment is covered, it must be covered equally for medical and mental health conditions.

The Court uses federal principles of statutory interpretation to interpret this federal law. Under these principles, "[s]tatutory interpretation begins with the language of the statute." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1026 (9th Cir. 2013) (citation and quotation marks omitted). When terms within a statute are not defined, those terms must be "accorded their plain and ordinary meaning, which can be deduced through reference sources such as general usage dictionaries." *Id.* When determining the meaning of a statute, however, courts "look not only to the particular statutory language, but to the design of the statute as a whole." *Crandon v. United States*, 494 U.S. 152, 158 (1990). Nonetheless, "statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985).

The Court thus begins its analysis by looking to the text of the Federal Parity Act. In pertinent part, it provides:

> In the case of a group health plan (or health insurance coverage
> offered in connection with such a plan) that provides both medical
> and surgical benefits and mental health or substance use disorder
> benefits, such plan or coverage shall ensure that—

---

[6] As discussed above, plan participants and beneficiaries of group policies may bring actions under ERISA's civil enforcement provision to challenge Federal Parity Act violations. ERISA provides individual participants and beneficiaries with a basis to challenge a plan for "any act or practice" that violates ERISA provisions, including the Federal Parity Act, which was enacted within ERISA.

> (i) the financial requirements applicable to such mental health or
> substance use disorder benefits are no more restrictive than the
> predominant financial requirements applied to substantially all
> medical and surgical benefits covered by the plan (or coverage),
> and there are no separate cost sharing requirements that are
> applicable only with respect to mental health or substance use
> disorder benefits; and
>
> (ii) the **treatment limitations** applicable to such mental health or
> substance use disorder benefits are no more restrictive than the
> predominant treatment limitations applied to substantially all
> medical and surgical benefits covered by the plan (or coverage)
> and there are no separate treatment limitations that are applicable
> only with respect to mental health or substance use disorder
> benefits.

29 U.S.C. § 1185a(3)(A)(i)-(ii) (emphasis added). The law defines "treatment limitation" as

follows: "The term 'treatment limitation' includes limits on the frequency of treatment, number

of visits, days of coverage, or other similar limits on the scope or duration of treatment." 29

U.S.C. § 1185a(3)(B)(iii).

The U.S. Department of Health and Human Services has issued regulations interpreting

the Federal Parity Act. In these regulations, the agency explains that the term "treatment

limitations" includes both quantitative and nonquantitative limitations:

> Treatment limitations include limits on benefits based on the
> frequency of treatment, number of visits, days of coverage, days in
> a waiting period, or other similar limits on the scope or duration of
> treatment. Treatment limitations include both quantitative
> treatment limitations, which are expressed numerically (such as 50
> outpatient visits per year), and nonquantitative treatment
> limitations, which otherwise limit the scope or duration of benefits
> for treatment under a plan or coverage. (See paragraph (c)(4)(ii) of
> this section for an illustrative list of nonquantitative treatment
> limitations.) A permanent exclusion of all benefits for a particular
> condition or disorder, however, is not a treatment limitation for
> purposes of this definition.

45 C.F.R. § 146.136(a); 29 C.F.R. § 2590.712(a). Included in the regulations is an illustrative list

of nonquantitative treatment limitations which include, of particular relevance, "[m]edical

management standards limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative." *Id.*

Plaintiffs argue that the Federal Parity Act prohibits Providence from denying ABA therapy under the Developmental Disability Exclusion because it is a "treatment limitation" that is applicable only to mental health disorders. Providence responds primarily with two arguments for the proposition that the Federal Parity Act does not preclude Providence from using the Developmental Disability Exclusion. First, Providence contends that the Developmental Disability Exclusion is not a "treatment limitation." Providence argues that the Federal Parity Act deals with treatment limitations that are "limits on benefits based on the frequency of treatment, number of visits, days of coverage, days in a waiting period," or other similar limits comparable to those listed. Providence argues that under the principal of *ejusdem generis*, which means that general words should be interpreted consistently with the specific words they follow, "treatment limitations" is limited to similar quantitative limits like "frequency of treatment, number of visits, days of coverage, days in a waiting period." The Developmental Disability Exclusion is not a numerical or quantitative limitation like those listed in the statute, and therefore, Providence argues, it is not a "treatment limitation." This argument is unpersuasive.

The statute itself and the related regulations explicitly note that the Federal Parity Act applies to both quantitative and nonquantitative limitations. *See* 45 C.F.R. § 146.136(a); 29 C.F.R. § 2590.712(a); *see also* Interim Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Policy and Addiction Equity Act of 2008, 75 Fed. Reg. 5410-01, 5413 (Feb. 2, 2010) ("The statute describes the term as including limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment, *but it is not limited to such types of limits*." (emphasis added)). Moreover, the principal of *ejusdem*

*generis* normally only comes into play when a general word follows a list of specific words. "The *ejusdem generis* canon applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012). In this instance, the statute provides examples of what treatment limitations might be after the term is used. The term "treatment limitations" does not appear as a general term at the end of a list of specifics.

The plain and ordinary meaning of "treatment limitation" includes and encompasses the Developmental Disability Exemption. It is a limitation on the treatment of plan members with developmental disabilities. The regulations bolster this interpretation, because they include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative," 29 C.F.R. § 2590.712, as an illustration of what a nonquantitative treatment limitation might be. Providence itself has used an "experimental" exemption and a "medical necessity" exemption in addition to the Developmental Disability Exemption when denying coverage for ABA therapy in the past. Thus, the Developmental Disability Exemption, like an experimental or medical necessity exemption, is a "treatment limitation" within the meaning of the Federal Parity Act.

Providence's second argument is that the Federal Parity Act does not require an insurance plan to cover any particular benefits or conditions, but instead merely requires that if Providence were to choose to cover a particular benefit, then they must cover it with equal restrictions as medical benefits. Plaintiffs respond that although the Federal Parity Act does not require coverage of any particular condition, it does require that any limitation on services of an already covered condition be equally applied to mental health and medical conditions. In other words, Providence would be free under the Federal Parity Act not to cover autism. But after Providence

chooses to cover autism, any limitation on services for autism must be applied with parity. Because Providence does cover autism, it cannot use the Developmental Disability Exclusion to deny coverage of ABA therapy because it is a "separate treatment limitation" that applies only to mental health disorders.

The Developmental Disability Exclusion applies specifically and exclusively to mental health conditions. The Federal Parity Act requires that a plan have "no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii). Providence's Developmental Disability Exclusion limits coverage of services "related to developmental disabilities, developmental delays or learning disabilities." Ross Decl. Ex. D at 8, Dkt. 41-4. Thus, Providence's exclusion is overtly applicable only to mental health conditions—specifically developmental disabilities—and does not apply to medical or surgical conditions. The plain text of the Federal Parity Act prohibits "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii). Thus, under the plain text of the statute, Providence's Developmental Disability Exclusion is prohibited.

## CONCLUSION

Plaintiffs' motion for partial summary judgment (Dkt. 59) is GRANTED, and Defendant's cross motion (Dkt. 67) is DENIED.

**IT IS SO ORDERED**.

DATED this 8th day of August, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

PAGE 26 – OPINION AND ORDER